United States District Court
Southern District of Texas
FILED
AUG 03 2026
Nathan Ochsner, Clerk

United States District Court
Southern District of Texas
**ENTERED**
August 03, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| **REYNOL G. VILLARREAL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 7:25-CV-0558** |
| | § | |
| **FRANK BISIGNANO, Commissioner of the Social Security Administration,** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM AND ORDER**

Plaintiff REYNOL G. VILLARREAL, appearing pro se, seeks judicial review of a final decision by the Commissioner (the "Commissioner") of the Social Security Administration (the "SSA") denying his application for disability insurance benefits under Title II of the Social Security Act. Through his Complaint (Dkt. No. 1), Plaintiff requests reversal of the final decision and remand for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g). At issue is whether there is substantial evidence to support certain determinations by the Administrative Law Judge (the "ALJ") for purposes of the five-step sequential disability evaluation. (Dkt. No. 14). More specifically, in terms of step three, Plaintiff contends that the ALJ erred in determining that his impairment of Post-Traumatic Stress Disorder ("PTSD") did not meet the respective impairment listed in the appendix to the SSA regulations. (*Id.* at 2-3). Plaintiff further complains that the ALJ erred in determining that he "is able to hold employment" despite his impairments, which generally relates to the step four and step five determinations over Plaintiff's "residual functional capacity" (or "RFC") to do work available in the national economy. (*Id.* at 3-4).

Through a responsive brief, the Commissioner argues that the ALJ's findings are supported by substantial evidence. (Dkt. No. 17). Plaintiff has replied to the Commissioner's brief. (Dkt. No. 22). This matter is now ripe for consideration.

Upon reviewing the parties' briefing, the record, and the relevant law, the Magistrate Judge concludes that the final decision of the Commissioner should be AFFIRMED.

## I. SOCIAL SECURITY FRAMEWORK

### A. Five-Step Sequential Evaluation

Social Security is a program whereby the federal government, through the SSA, provides monetary benefits to eligible individuals with disabilities. *United States v. Froehlich*, 2011 WL 13286700, at *1 (C.D. Cal. Feb. 25, 2011). In determining whether a claimant is disabled and entitled to benefits, the SSA applies the five-step sequential process articulated by 20 C.F.R. § 404.1520(a)(4), which involves asking whether:

> (1) the claimant is participating in substantial gainful activity; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the [SSA] regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform other relevant work.

*Winterroth v. Comm'r of Soc. Sec.*, 2021 WL 5639618, at *5 (S.D. Tex. Dec. 1, 2021) (citing *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995) (per curiam)).

In assessing the first step, a finding that the claimant is participating in substantial gainful activity—or work that involves significant physical or mental activities and is done for profit—precludes a finding of disability. 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1572.

If a claimant is not engaging in substantial gainful activity, the analysis proceeds to "step two," where it is determined whether the claimant has a medical impairment (or combination of impairments) that is "severe," or that significantly limits their ability to perform work activities.

*Id.* §§ 404.1520(a)(4)(ii), (c), 404.1522. The impairment must have lasted or be expected to last for a continuous twelve-month period unless it is expected to result in death. *Id.* § 404.1509.

At the third step, a determination that an impairment is of sufficient duration and meets or exceeds an impairment listed in the appendix to the applicable SSA regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1, necessitates a finding of disability, such that the claimant is entitled to benefits, *id.* § 404.1520(a)(4)(iii), (d). "Listed impairments are descriptions of various physical and mental illnesses and abnormalities generally characterized by the body system they affect[,]" and each "is defined in terms of several specific medical signs, symptoms, or laboratory test results." *Parker v. Colvin*, 2015 WL 6566008, at *2 (M.D. La. Oct. 30, 2015). The listing criteria is considered stringent, *id.* (citing *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994)), such that "[a]n impairment that exhibits only some of the criteria, no matter how severely, does not qualify," *id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990)).

Considered as part of the "step three" determination are any mental impairments, or "the degree of functional loss resulting from the impairment in four separate areas deemed essential for work." *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001); 20 C.F.R. § 404.1520a(a), (c)(3), (d)(1), (2). This evaluation, referred to as the psychiatric review technique, concerns a claimant's ability to do the following: (i) understand, remember, or apply information; (ii) interact with others; (iii) concentrate, persist, or maintain pace; and (iv) adapt or manage oneself. *Owen v. Astrue*, 2011 WL 588048, at *14 (N.D. Tex. Feb. 9, 2011); 20 C.F.R. § 404.1520a(c)(3). The degree of limitation in these areas is rated on a five-point scale: (i) none, (ii) mild, (iii) moderate, (iv) marked, and (v) extreme. 20 C.F.R. § 404.1520a(c)(4). A rating of "none" or "mild" will generally lead to the conclusion that the impairment is not severe. *Id.* § 404.1520a(d)(1). A "marked" limitation means that "functioning in [the areas of mental

functioning] independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(d). An "extreme" limitation refers to the inability to function "independently, appropriately or effectively, and on a sustained basis." *Id.* § 12.00(F)(2)(e). Indeed, "[this] last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." 20 C.F.R § 404.1520a(c)(4).

If the severity of the mental impairment meets or exceeds that of a mental disorder listed in the applicable appendix and the impairment is of sufficient duration, the claimant is disabled and entitled to benefits. *See id.* §§ 404.1520(a)(4)(iii), (d), 404.1520a(d)(2), (3). Relevant here are Listing 12.04 of the appendix to the SSA regulations—concerning Depressive, Bipolar and Related Disorders—and Listing 12.15—concerning Trauma- and Stressor-Related Disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.15. Under each listing, a claimant must provide sufficient medical documentation of their impairment, based on what is referred to as the paragraph "A" requirement, while also establishing either the paragraph "B" or paragraph "C" criteria. *Id.* Paragraph B requires a showing of either an "extreme" limitation in one of the areas of mental functioning or a "marked" limitation in two of the areas. *Id.* Paragraph C requires a showing that the claimant's "mental disorder in [the respective] listing category is 'serious and persistent;' that is, [the claimant has] a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both . . . [treatment and marginal adjustment]." *Id.* Treatment involves "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder[.]" *Id.* Otherwise, "marginal

adjustment" means that the claimant has "minimal capacity to adapt to changes in [their] environment or to demands that are not already part of [their] daily life[.]" *Id.*

If the third step is not satisfied, the analysis proceeds to "step four," where the claimant's RFC is assessed and it is determined whether the claimant can still perform the requirements of any past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). RFC refers to a claimant's ability to do physical and mental work activities on a regular and continuing basis despite any limitations from impairments. *Id.* § 404.1545. A "regular and continuing basis" means eight hours a day for five days a week, or an equivalent work schedule. SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996). "Past relevant work is work that [the claimant has] done within the past five years that was substantial gainful activity and that lasted long enough for [the claimant] to learn to do it[.]" 20 C.F.R. § 404.1560(b)(1)(i). Work will not be considered for this purpose if the claimant started and stopped it in fewer than 30 calendar days. *Id.* If the claimant's RFC allows them to complete past relevant work, then they are not disabled. *Id.* §§ 404.1520(a)(4)(iv), 404.1560(b)(3).

If a claimant cannot complete past relevant work, the analysis proceeds to the fifth and final step, where it is determined whether they can do any other work considering their RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v), (g)(1). If the claimant is unable to do any other work considering these factors, they are disabled. *Id.* §§ 404.1520(a)(4)(v), (g)(1), 404.1560(c)(1). If the claimant can adjust to other work, they are not disabled. *Id.*

Although the claimant has the initial burden of proving disability, the burden shifts at the fifth step to the SSA to show that the claimant can perform work in the national economy. *Id.* § 404.1560(c)(2); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). To satisfy this burden, the SSA must produce vocational expert testimony or other similar evidence. *Fields v. Bowen*, 805 F.2d

1168, 1170 (5th Cir. 1986) (per curiam). The vocational expert will assess the effect of any limitation on a given range of work and then opine whether the claimant's RFC permits them to perform any substantial occupation within the range of work at issue. *Conaway v. Astrue*, 2008 WL 4865549, at *4 (N.D. Tex. Nov. 10, 2008); *see also* SSR 00-4P, 2000 WL 1898704, at *1-2 (Dec. 4, 2000). Where the claimant can perform all or substantially all the exertional requirements at a given range of work, the Medical-Vocational Guidelines, 20 C.F.R. § Pt. 404, Subpt. P, App. 2, govern the disability determination by the SSA. *Edwards v. Colvin*, 2014 WL 3797366, at *12 (S.D. Tex. July 30, 2014); *see* SSR 83-11, 1983 WL 31252 (Jan. 1, 1983). If the SSA's burden is met, the burden then shifts back to the claimant to show that they cannot perform the alternate work. *Fields*, 805 F.2d at 1170.

Typically relied on by vocational experts is the Department of Labor's Dictionary of Occupational Titles (the "DOT"), which provides "standardized occupational information to support job placement activities[,]" or list descriptions of the requirements for different jobs in the national economy.[1] *Dictionary of Occupational Titles* at xv (4th ed. 1991); *see also* SSR 00-4P, 2000 WL 1898704, at *2; 20 C.F.R. § 404.1566(d)(1). Vocational experts regularly cite to the Specific Vocational Preparation (the "SVP") metric, which quantifies the time "required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dictionary of Occupational Titles*, app. C (4th ed. 1991). SVP levels range from level 1, which indicates that average performance requires only a short demonstration, to level 9, which would require over 10 years of preparation. *Id.* While neither the vocational expert testimony nor the DOT is per se controlling for purposes of the five-step determination, *see Carey v. Apfel*, 230 F.3d 146, 147 (5th Cir. 2000), the

[1] The two volumes of the DOT are available at www.dol.gov/agencies/oalj/topics/libraries/LIBDOT (last visited May 18, 2026).

testimony should generally be consistent with the occupational information in the DOT, *see* SSR 00-4P, 2000 WL 1898704, at *2.

In making disability determinations, the SSA considers medical opinions by medical sources, or licensed healthcare workers who work within the scope of their practice. *See* 20 C.F.R. §§ 404.1502(d), 404.1520c. In assessing a medical opinion, the SSA considers five factors: (i) the supportability of the opinion; (ii) the consistency of the opinion with evidence from other medical sources in the record; (iii) the medical source's treatment relationship with the claimant; (iv) the specialization of the medical source regarding pertinent medical issues; and (v) other factors which tend to support or contradict the opinion. *Id.* § 404.1520c(c). The most important of these factors are supportability and consistency, such that, for claims filed on or after March 27, 2017, the SSA is required to explain its analysis regarding the same. *Id.* § 404.1520c(b)(2).

**B. <u>Review of Non-Disability Determinations</u>**

A claimant may seek reconsideration of an initial finding of non-disability. *See* 42 U.S.C. § 1395ff(b)(1)(A). If the denial is upheld on reconsideration, a claimant may request a hearing before an ALJ, who will issue a written decision regarding the claimant's ostensible disability. *See* 20 C.F.R. §§ 404.929, 404.953(a). A claimant may then request review of the ALJ's decision by the Social Security Appeals Council (the "Appeals Council"). *Id.* § 404.967. If the Appeals Council denies a request for review or otherwise upholds an unfavorable decision by the ALJ, the claimant can seek judicial review in an appropriate federal district court. *See* 42 U.S.C. § 405(g); *see also id.* § 1395ff(b)(1)(A).

## II. ADMINISTRATIVE HISTORY

In August 2023, Plaintiff filed his application for benefits. (*See* Dkt. No. 10-6 at 2-5; *see also* Dkt. No. 10-7 at 2-9). In doing so, Plaintiff claimed that he stopped working as early as March 2023 due to PTSD along with several physical conditions, including musculoskeletal issues. (*See* Dkt. No. 10-6 at 2; *see also* Dkt. No. 10-7 at 3).

In October 2023, the SSA denied Plaintiff's application based on a finding that he was not disabled. (Dkt. No. 10-5 at 2-5). Plaintiff sought reconsideration of the denial. (*See id.* at 6). In November 2024, the SSA affirmed its initial decision. (*Id.* at 14-16). Plaintiff then requested a hearing before an ALJ. (*Id.* at 17-18).

The hearing was held in June 2025. (Dkt. No. 10-3 at 36-61). Plaintiff appeared pro se and in person. (*See id.* at 38-39). During the hearing, Plaintiff testified regarding his work history, medical conditions, and functional limitations. (*Id.* at 42-56, 60-61). Julia Gutierrez, PhD, a vocational expert, testified as to Plaintiff's ability to complete hypothetical tasks and perform related employment duties. (*Id.* at 56-60).

In July 2025, the ALJ issued a decision unfavorable to Plaintiff. (*Id.* at 12-31). The ALJ determined that Plaintiff: had impairments not severe enough for a categorical determination of disability; retained the functional capacity to perform some light work; could perform work existing in significant numbers in the national economy; and thus, was not disabled.

In September 2025, the Appeals Council denied Plaintiff's request for review (*id.* at 2-6), finding "no reason under [the] rules to review the [ALJ's] decision" (*id.* at 2). As a result, the decision by the ALJ became the final decision of the Commissioner. (*Id.*).

In December 2025, having exhausted his administrative remedies, Plaintiff filed for judicial review of the final decision. (Dkt. No. 1).

## III. EVIDENTIARY RECORD

### A. Work History

Given the nature of Plaintiff's claims, the Magistrate Judge will review Plaintiff's reports of his work history in the evidentiary record.

Plaintiff served in the U.S. Army from 2001 to 2014. (*See* Dkt. No. 10-6 at 2, 24). During his military service, Plaintiff was deployed several times to Iraq and detainee prison camps. (Dkt. No. 10-3 at 55-56). Plaintiff reportedly saw over 30 months of combat, including time as a combat medic treating casualties. (*Id.*).

Plaintiff transitioned to the private sector in 2014 and worked at different times during the next few years as an oilfield driver and concrete pump operator. (*See* Dkt. No. 10-7 at 4).

From 2018 to 2021, Plaintiff worked with Magic Valley Concrete, LLC out of Palmview, Texas. (*See* Dkt. No. 10-6 at 6; *see also* Dkt. No. 10-7 at 4). Starting off as a concrete salesman, Plaintiff eventually took on the role, again, of a concrete pump operator, pouring concrete on commercial and industrial construction sites and highway construction projects. (Dkt. No. 10-3 at 44). Plaintiff reported that his job involved heavy lifting, frequent climbing on equipment, and exposure to the elements. (*Id.* at 44-45).

From 2021 to 2022, Plaintiff worked at a different construction company, Dragados-Pulice Joint Venture. (*See* Dkt. No. 10-6 at 7; *see also* Dkt. No. 10-7 at 4). His job duties included those of a concrete pump operator. (Dkt. No. 10-3 at 44). Like Plaintiff's prior job, this one involved heavy lifting and frequent climbing. (*Id.*).

Starting in 2022, Plaintiff worked out of Alton, Texas at Texas Quick Jet, LLC. (Dkt. No. 10-6 at 7). His job duties involved the operation of heavy equipment used to flush out concrete mixer trucks. (Dkt. No. 10-3 at 43). Plaintiff stopped working in March 2023

reportedly due, again, to PTSD and various musculoskeletal conditions. (*See* Dkt. No. 10-6 at 2; *see also* Dkt. No. 10-7 at 3).

As discussed in further detail below, Plaintiff would testify to the ALJ about being "fired" from his last three jobs due to "conflicts with supervisors" and his "problems with authority." (*See* Dkt. No. 10-3 at 45-48). Such self-reports, however, are contradicted by other parts of the record. (*See* Dkt. No. 10-7 at 31). Through his application for benefits, Plaintiff indicated that he got along "okay" with "authority figures," like bosses. (*Id.*). He also indicated "no" in response to the question of whether he had "ever been fired or laid off from a job because of problems getting along with other people." (*Id.*).

**B. <u>Medical Evidence</u>**

Also relevant to the instant determination is the medical evidence as it relates to Plaintiff's diagnosis of PTSD and his overall mental functioning.

As early as October 2013, Plaintiff was determined entitled to Department of Veterans Affairs ("VA") disability compensation benefits based on a determination that he had developed certain disabilities in connection with his military service.[2] (*See* Dkt. No. 10-6 at 59). At such time, Plaintiff was assigned a 30 percent disability for chronic "adjustment disorder with anxiety" (which Plaintiff claimed as "depression and PTSD") based on Plaintiff's overall mental functioning and symptoms of anxiety, chronic sleep impairment, and depressed mood. (*Id.* at 64). His mental functioning was deemed to indicate "mild" impairments, or "some difficulty" in

[2] Plaintiff references the VA's disability determination in the opening to his initial briefing. (Dkt. No. 14 at 1). The Commissioner would cite to 20 C.F.R. § 404.1504, which provides that disability determinations by other governmental agencies, such as the VA, are not binding on the SSA. (Dkt. No. 17 at 9). That said, Plaintiff seems to refer to the VA's disability determination merely for purposes of providing context and background. The Magistrate Judge also notes that Plaintiff's VA medical records were considered by the ALJ.

social and occupational settings but "generally functioning pretty well" and with "some meaningful interpersonal relationships." (*Id.*).

In June 2019, the VA raised Plaintiff's evaluated disability for PTSD to 50 percent. (*Id.* at 37). The VA noted that, although a diagnosis of adjustment disorder with anxiety was appropriate at the time of Plaintiff's discharge, "as time ha[d] progressed[,] the symptoms of [PTSD] ha[d] developed an[d] intensified[.]" (*Id.*). The 50 percent evaluation was based on Plaintiff's symptoms of suspiciousness, depressed mood, disturbances of motivation and mood, flattened affect, anxiety, chronic sleep impairment, and "[o]ccupational and social impairment with reduced reliability and productivity[.]" (*Id.*).

In April 2021, Plaintiff saw a psychiatric provider with the VA for medication management. (Dkt. No. 10-8 at 93-97). Christie A. Ybarra, MD noted that Plaintiff was "well overall," although he expressed disappointment and frustration at having been evicted from his apartment due to his failure to pay attention to notices concerning his rent and court hearings. (*Id.* at 94-95). Dr. Ybarra further noted that Plaintiff was "managing his anger and frustration well[,]" had found another apartment, and was seeking legal recourse with respect to the eviction. (*Id.* at 95). Plaintiff otherwise denied persistent depressed mood and persistent irritability. (*Id.*). No impairments were noted in his mental status, including the fields of his interpersonal interaction, speech, mood, fund of knowledge, thought content, thought process, cognition, attention, concentration, orientation, insight, and judgment. (*Id.*). Plaintiff was continued on Sertraline for mood and Trazodone for sleep. (*See id.* at 96).

In June 2021, Plaintiff saw Dr. Ybarra for a medication management follow-up. (*Id.* at 88-91). Dr. Ybarra noted that Plaintiff was "well overall," although he expressed loneliness and frustration associated with his inability to maintain romantic relationships. (*Id.* at 89). Plaintiff

otherwise denied persistent depressed mood and persistent irritability. (*Id.*). No impairments were noted in his mental status. (*Id.* at 89-90). Plaintiff reported that his medications improved his symptoms, and he was continued on his medications. (*Id.*).

In July 2021, Plaintiff saw Dr. Ybarra for another follow-up. (*Id.* at 82-85). Plaintiff reported recent relationship and work stressors but stated that he did not feel "overwhelmed" and was otherwise managing his problems well. (*Id.* at 82-83). Plaintiff denied persistent depressed mood and persistent irritability. (*Id.* at 83). No impairments were noted in his mental status, including the fields of his personal appearance, attitude, speech, mood, affect, fund of knowledge, thought content, thought process, cognition, attention, concentration, insight, and judgment. (*Id.* at 83-84). Plaintiff was continued on his medications. (*Id.* at 85).

In August 2021, Plaintiff had his next follow-up. (*Id.* at 78-80). Although Plaintiff reported having been fired supposedly for raising work-related concerns, he had since found a new, more favorable job. (*Id.* at 78). Plaintiff did not otherwise raise any concerns, while denying persistent depressed mood, low motivation, and isolation from family. (*Id.*). No impairments were noted in his mental status. (*Id.* at 79). Plaintiff was continued on his medications. (*Id.* at 79-80).

In October 2021, Plaintiff followed up again with Dr. Ybarra. (*Id.* at 74-76). She noted that Plaintiff was "well overall." (*Id.* at 74). Although Plaintiff reported feeling "sad and lonely" on occasions "when he ha[d] the evenings to himself[,]" Plaintiff otherwise denied persistent depressed mood and similar symptoms. (*Id.*). No impairments were noted in his mental status. (*Id.* at 75). Plaintiff was continued on his medications. (*Id.* at 74-75).

In January 2022, Plaintiff did not appear for a follow-up with Dr. Ybarra, advising that he was busy with work and would reschedule when he was available. (*Id.* at 184).

As noted, in August 2023, Plaintiff filed his initial application for benefits (*see* Dkt. No. 10-6 at 2-5; *see also* Dkt. No. 10-7 at 2-9), which was denied in October 2023 (Dkt. No. 5 at 2-5). As part of the disability determination explanation, a state agency medical consultant, Eric Wiener, PhD, indicated that there was insufficient evidence to assess Plaintiff's current mental functioning because Plaintiff did not return the requested questionnaire forms. (Dkt. No. 10-4 at 4-5). A VA contact also seems to have informed Dr. Wiener that, in June 2023 (or just two months before he applied for benefits), Plaintiff claimed to be "doing good" and was not interested in scheduling an appointment with the VA's behavioral health program. (*See id.* at 5).

In July 2024, at a primary health care visit with the VA, Plaintiff screened "negative" for PTSD and depression. (*See* Dkt. No. 10-8 at 153-54). As part of the PTSD screening, Plaintiff answered "no" when asked whether he had ever experienced traumatic events as serious as, for example, "[s]eeing someone be killed or seriously injured[.]" (*Id.* at 153). For the depression screening, Plaintiff answered "not at all" when asked how often, in the past two weeks, he had experienced "[l]ittle interest or pleasure in doing things" and "[f]eeling down, depressed, or hopeless[.]" (*Id.*).

In September 2024, when applying for reconsideration of the initial disability denial, Plaintiff saw Juan Salazar, MD for a physical consultative exam. (*See id.* at 221-27). Although the examiner noted Plaintiff's history of depression and PTSD, the examiner opined that Plaintiff was cooperative, and his mood, affect, and judgment were normal. (*Id.* at 222). The examiner also noted no memory difficulties, anxiety, depression, or sleeping problems. (*Id.* at 221).

In October 2024, Plaintiff saw Ruben Piña, PhD for a consultative psychological exam. (Dkt. No. 10-4 at 13-14; Dkt. No. 10-8 at 379-82). Plaintiff described his chief problems as PTSD, depression, anxiety, insomnia, and anger issues. (Dkt. No. 10-8 at 379). In terms of

adaptive functioning, Plaintiff stated that he was able to care for himself independently, although he could not readily manage money. (*Id.* at 380). He reported that his typical day included staying home and sometimes running errands with his father. (*Id.*). As for mental status, Plaintiff's appearance and presentation were deemed by the examiner to be effectively normal, such that Plaintiff was "casually but appropriately dressed[,]" and his speech was "normal in rate and loud in tone." (*Id.*). His attitude, mood, and affect were deemed "appropriate," and Plaintiff was cooperative insofar as he sat upright, answered the examiner's questions, and made good eye contact. (*Id.* at 380-81). Plaintiff's thought process was deemed to be "goal-oriented" and logical, with no evidence of loose associations. (*Id.* at 380). Plaintiff denied audio or visual hallucinations. (*Id.* at 381). The examiner did not note any issues with or deficits in sensorium and cognition, concentration and memory, and judgment and insight. (*Id.*). At the same time, the examiner made the overall observation that Plaintiff "had difficulty with attending, concentrating, and persisting during the exam." (*Id.* at 382). Based on client observations and Plaintiff's reports of his medical, social, and work histories, the examiner diagnosed Plaintiff with PTSD. (*Id.* at 381-82). In assessing functional capacity, the examiner opined that—

> [Plaintiff] has limitations in various settings based on observations during the examination to understand, remember, and apply information. [Plaintiff] cannot concentrate, persist, and maintain pace with the ability to focus attention on work activities and stay on task at a sustained rate. [Plaintiff] cannot adapt and manage himself, such as regulating emotions, controlling behavior, and maintaining well-being.

(*Id.* at 382).

### C. <u>Hearing Testimony</u>

At the hearing before the ALJ, Plaintiff testified regarding his work history, medical conditions, and functional limitations. (Dkt. No. 10-3 at 42-56, 60-61).

Concerning his living situation and overall mental functioning, Plaintiff testified to residing with his father, stepmother, and minor niece. (*Id.* at 50-51). He is divorced with two adult children, whom he rarely speaks to or sees. (*Id.* at 50, 61). According to Plaintiff, his average day consisted of watching television in his room, eating his meals, taking his medications, and going in and out of sleep for differing intervals. (*Id.* at 51). Plaintiff performed his own chores, like washing his laundry, cleaning his room, and washing his dishes. (*Id.* at 52). Plaintiff stated that he had no current hobbies other than going on occasional horseback rides at his grandfather's ranch in Mexico. (*Id.* at 52-53).

In terms of social interactions, Plaintiff reported that he mostly kept to his room to "avoid drama." (*Id.*). According to Plaintiff, he was prone to "snap and go off" on others, including his own family while doing household projects. (*Id.* at 46). Plaintiff testified that he tended to become angry when others were not paying attention and he was forced to repeat himself. (*Id.* at 47). Nevertheless, Plaintiff stated that he did sometimes socialize with friends outside his home, meeting them for dinner or for barbecues. (*Id.* at 51-52).

Plaintiff reported being "fired" from his last three jobs due to "conflicts with supervisors" and his "problems with authority." (*See id.* at 45-48). According to Plaintiff, these issues with "insubordination" went as far back as his days in the military. (*See id.* at 47). Plaintiff testified that his PTSD was "triggered" when he was "talked backed to" or "second guessed" by his supervisors, especially in situations where Plaintiff felt he was more experienced than they were and he could prove he was doing things correctly. (*Id.* at 46).

Plaintiff also testified to experiencing PTSD symptoms:

> At times, I can just—I've had episodes of flashbacks from when I was deployed. I'm a three-time combat veteran. And at times, I just—my mind will wander off on its own. And I've had flashbacks. I've had dreams that'll wake me up. If I'm asleep, and somebody tries to wake me up from the waist up, I wake up swinging.

> I, you know—I hate to say it. But I wake up swinging if—and it's at no fault of that person. It's just—my body's triggered that way. If I see certain things, or a certain something that'll remind me of something from while I'm being deployed—I will start shaking.

(*Id.* at 55).

Dr. Gutierrez, the vocational expert, also testified at the hearing. (*Id.* at 56-60). The ALJ specifically asked Dr. Gutierrez whether a hypothetical individual would be able to perform Plaintiff's past work as a concrete pump operator assuming they were of "younger" age with a high school education and with a residual functional capacity to do the following: lift or carry 20 pounds occasionally and 10 pounds frequently; stand or walk six hours out of an eight-hour day and sit six hours out of an eight-hour day; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ropes, ladders or scaffolds; perform tasks that never require exposure to hazards, such as working on high, exposed places or in proximity to moving, mechanical parts; understand, remember, and carry out simple instructions to perform simple tasks, without a specific production rate pace, such as on an assembly line; communicate and interact occasionally with co-workers and supervisors, but never with the public; and adapt to occasional changes in a routine work environment. (*Id.* at 56-57). Dr. Gutierrez opined that such a hypothetical individual would be unable to perform Plaintiff's prior work. (*Id.* at 57). However, Dr. Gutierrez identified three occupations at the light exertional level that the hypothetical individual could perform: (i) a marking clerk, DOT 209.587-034, with 170,000 jobs available in the national economy; (ii) a marker, DOT 222.587-038, with 20,000 jobs available; and (iii) a routing clerk, DOT 222.687-022, with 120,000 jobs available. (*Id.*). According to Dr. Gutierrez, the hypothetical individual would be unable to maintain employment with respect to any of these jobs if they frequently demonstrated aggressive or hostile behavior to co-workers or supervisors or if they were frequently insubordinate. (*Id.* at 59).

## IV. DETERMINATION BY THE ALJ

In applying the first step of the sequential process described above, the ALJ determined that Plaintiff did not engage in substantial gainful activity during the period under review. (Dkt. No. 10-3 at 14-15).

At step two, the ALJ determined that Plaintiff suffered from severe impairments, that is, right shoulder rotator cuff impingement syndrome and sprain of the acromioclavicular ligament, type 2 diabetes mellitus, obesity, major depressive disorder, and PTSD. (*Id.* at 15-16).

Moving to step three, the ALJ determined that Plaintiff's impairments did not meet or exceed the severity of those listed in the applicable appendix to the SSA regulations. (*Id.* at 16-22). With specific respect to Plaintiff's impairment of PTSD, the ALJ determined as follows:

> The severity of [Plaintiff's] mental impairments, considered singly and in combination, does not meet or medically equal the criteria of listings 12.04 [or Depressive, Bipolar and Related Disorders] and 12.15 [or Trauma- and Stressor-Related Disorders]. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairment must result in at least one extreme or two marked limitations in a broad area of functioning that are understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.
>
> In understanding, remembering or applying information, [Plaintiff] has no limitation.
>
> In a Function Report, [Plaintiff] reported that he had difficulty with daily living and needed daily assistance with everything. He indicated that he woke up shouting, sweating, and in fear. [Plaintiff] mentioned that he needed reminders to take his medicine since he could not remember time or dates. He reported that he did not prepare meals since he could not focus and was easily distracted. [Plaintiff] indicated that he could not do household chores since he could not apply force or pressure with his hands, legs, and feet. He mentioned that he did not go out alone since he became lost, anxious, and depressed. [Plaintiff] reported that he did not drive since he could not focus or apply pressure with his hands,

legs, and feet. He indicated that his family did all of the shopping, and he did not handle money. [Plaintiff] mentioned that he had no hobbies or interests.

Then, in a Disability Report, [Plaintiff] reported that his physical symptoms made tasks like cooking and maintaining his home difficult, and he had disrupted sleep due to nightmares and physical discomfort, leaving him fatigued and unable to participate in hobbies or family activities.

At a psychological consultative examination in October 2024, [Plaintiff] indicated that he lived with his father, who was the only one who could calm him down. He mentioned that his father had "outranked" him, and he respected that. [Plaintiff] said that he enjoyed being alone and watching television. He stated that he used to enjoy riding his motorcycle, but he had to sell it. [Plaintiff] reported that he could not manage money, but he was able to go to the store independently. He indicated that in a typical day, he stayed home but sometimes ran errands with his father. [Plaintiff's] immediate, remote, and recent memory were intact. He correctly named the current and former presidents of the United States and recalled 3 out of 3 words after 5 minutes.

[Plaintiff] testified that he lives in a house with his father who recently retired, stepmother, and six- or seven-year-old niece. He said that he is divorced and has two adult children. [Plaintiff] stated that he usually wakes up between 8:00 a.m. and 10:00 a.m., takes his medication, eats something, stays in his room, is in and out of sleep all day, takes his medications at 6:00 p.m., eats something, takes a nap between 8:00 p.m. and 10:00 p.m., watches television in his room until 3:00 a.m. or 4:00 a.m., and falls asleep for 3 to 4 hours. He reported that he knows he has to get up to take his medications. [Plaintiff] indicated that sometimes throughout the day, he falls asleep between about 1:00 p.m. and 4:00 p.m. He mentioned that he walks around when he goes outside to smoke a cigarette or vape, which is not permitted inside of the house.

[Plaintiff] testified that as far as chores, he washes his own laundry, cleans his room, and washes any dishes that he uses. He said that his stepmother is the one who usually cooks. [Plaintiff] stated that his hobby is watching television. He reported that about 2 to 3 times a year, when they visit his grandfather's ranch in Mexico, he goes horseback riding. [Plaintiff] indicated that he did not have hobbies before he stopped working since all he did was work.

In interacting with others, [Plaintiff] has a moderate limitation.

In the Function Report, [Plaintiff] indicated that he had mood swings. He mentioned that he became easily annoyed around others, he became angry, and he lashed out. [Plaintiff] reported that his family did all of the shopping. He indicated that daily, he spent time with family who took care of him for meals, reminders, etc. [Plaintiff] mentioned that he did not have a social life, but he had no problems getting along with others. He reported that he got along okay with

authority figures and had never been fired or laid off from a job due to problems getting along with others.

Then, in the Disability Report, [Plaintiff] indicated that he avoided social interactions entirely since they frequently triggered heightened emotional responses, leading to impulsive and explosive reactions. He mentioned that his symptoms led to [his] avoidance of crowded or unfamiliar places, contributing to his sense of isolation.

Despite the aforementioned complaints, the field office noted that [Plaintiff's] behavior was calm and fair.

At the physical consultative examination in September 2024, [Plaintiff] was cooperative, and his mood and affect were normal.

The following month, at the psychological consultative examination, [Plaintiff] reported that he had a "very short fuse." He indicated that he did not want to leave the house since he was "triggered." [Plaintiff] mentioned that he did not want to spend time with friends. He admitted that he was unhappy with himself. [Plaintiff] said that he had dated a girl for four months, and she blocked him after they broke up. He stated that his brother had called him and threatened to place a restraining order against him. Despite complaints, [Plaintiff] reported that he was unable to work due to his physical inabilities. He admitted that he just sat at home, and his symptoms worsened. [Plaintiff] indicated that he lived with his father, who was the only one who could calm him down. He mentioned that he enjoyed being alone and watching television. [Plaintiff] said that he had difficulty when he was told he was doing something wrong. He stated that he was able to go to the store independently and sometimes ran errands with his father.

At the psychological consultative examination, [Plaintiff's] tone was loud, but his speech rate was normal. He demonstrated an appropriate attitude during the interview, sat upright on his chair, and answered all of the examiner's questions. [Plaintiff's] mood was appropriate, with mood congruent affect. His eye contact was good.

Medical treatment notes dated March 2025 reveal that [Plaintiff's] mood and affect were normal.

[Plaintiff] testified that he had three consecutive jobs in which he had conflicts with supervisors. He explained that he knew his job, but others would tell him he was doing the job incorrectly. [Plaintiff] stated that he tried to explain to his supervisors how he did the job and prove that he was doing the job correctly. He reported that they interpreted this as undermining authority. [Plaintiff] indicated that when he tried to explain something to his supervisors, if they became loud, he would "snap" and talked to them the same way they talked to him. He mentioned that he was fired from the jobs and looked for other work but was denied

employment. [Plaintiff] explained that everyone in the concrete business talks to one another, and he was told that he was a problematic worker and not easy to get along with. He said that he disagreed with that. [Plaintiff] stated that these circumstances affect his PTSD, as he cannot tolerate when others talk back or second guess that he is doing things correctly, especially when he can prove that he is correct. He reported that his PTSD is triggered when supervisors think that they are more experienced than he is. [Plaintiff] indicated that in many situations, his supervisors did not have more experience than him.

[Plaintiff] testified that he "snaps and goes off" on others, even with his own family while doing household projects. He said that it is difficult for him to work around others. [Plaintiff] stated that if someone is not paying attention to him when they should and he has to constantly repeat himself, this triggers his anger quickly. He reported that he has a military background where you know rules and regulations, the way things are supposed to be done. [Plaintiff] indicated that he was charged with insubordination when he was in the military. He mentioned that he socializes with friends on occasion. [Plaintiff] said that he goes to his friends' house or meets his friends somewhere like for dinner or a barbecue. He stated there are few people with whom he interacts. [Plaintiff] reported that as far as family, his sister just moved from San Antonio, and he has his mother. He indicated that he is not more engaged with activities outside of his room since he tries to avoid drama. [Plaintiff] mentioned that he does not like much confrontation with others or any type of drama associated with it. He said that he currently does not have a relationship with his children and goes months without talking to them or seeing them. [Plaintiff] stated that his son attends a college.

With regard to concentrating, persisting or maintaining pace, [Plaintiff] has a mild limitation.

In the Function Report, [Plaintiff] reported that his mind raced, and he was easily distracted. He indicated that he woke up disoriented. [Plaintiff] mentioned that he could pay attention for 2 to 3 minutes and did not finish what he started. He reported that he could not follow written instructions well at all since he could not focus. [Plaintiff] indicated that he could not follow spoken instructions well at all since he could not comprehend. He mentioned that he did not prepare meals since he could not focus and was easily distracted. [Plaintiff] reported that he could not drive since he could not focus or apply pressure with his hands, legs, and feet. He indicated that he did not handle money.

Then, in the Disability Report, [Plaintiff] mentioned that his difficulty concentrating exacerbated his difficulties with even the simplest tasks, turning basic responsibilities into challenges.

At the psychological consultative examination in October 2024, [Plaintiff] said that he could not manage money. However, he was able to complete simple math,

correctly count in denominations of 2s and 3s, and spell the word "world" forward and backward.

[Plaintiff] testified that his stepmother is the one who usually cooks. He said that his hobby is watching television. [Plaintiff] responded throughout the hearing without difficulty.

As for adapting or managing oneself, [Plaintiff] has experienced a moderate limitation.

In the Function Report, [Plaintiff] indicated that he needed reminders as far as personal hygiene like to put on deodorant. He mentioned that daily, he spent time with family who took care of him. [Plaintiff] reported that he could not handle any stress at all since he quickly felt rapid heartbeat and panic attack. He indicated that he could not handle changes in routine, as he could not keep or make a schedule. [Plaintiff] mentioned that he became easily annoyed around others, he became angry, and he lashed out.

Then, in the Disability Report, [Plaintiff] reported that expressing his needs felt nearly impossible, often culminating in overwhelming episodes of distress that left him feeling like a burden and consumed by feelings of inadequacy. He indicated that his PTSD manifested as hypervigilance, flashbacks, and difficulty managing stress that affected his ability to engage in social activities or maintain consistent routines. [Plaintiff] mentioned that his conditions caused obstacles that interfered with his independence and quality of life.

In October 2024, at the psychological consultative examination, [Plaintiff] reported that he had a "very short fuse." He indicated that he did not want to leave the house since he was "triggered." [Plaintiff] mentioned that he did not want to spend time with friends. He admitted that he was unhappy with himself. [Plaintiff] said that he had dated a girl for four months, and she blocked him after they broke up. He stated that his brother had called him and threatened to place a restraining order against him. [Plaintiff] indicated that he lived with his father, who was the only one who could calm him down. He mentioned that he enjoyed being alone and watching television. [Plaintiff] said that he had difficulty when he was told he was doing something wrong. He stated that he was able to go to the store independently and sometimes ran errands with his father. [Plaintiff] indicated that he was able to dress and bathe independently. He was appropriately dressed. [Plaintiff] demonstrated an appropriate attitude during the interview, sat upright on his chair, and answered all of the examiner's questions. His mood was appropriate, with mood congruent affect.

Medical treatment notes dated March 2025 reveal that [Plaintiff's] mood and affect were normal.

> [Plaintiff] testified that he had three consecutive jobs in which he had conflicts with supervisors. He explained that he knew his job, but others would tell him he was doing the job incorrectly. [Plaintiff] stated that he tried to explain to his supervisors how he did the job and prove that he was doing the job correctly. He reported that they interpreted this as undermining authority. [Plaintiff] indicated that when he tried to explain something to his supervisors, if they became loud, he would "snap" and talked to them the same way they talked to him. He mentioned that he was fired from the jobs and looked for other work but was denied employment. [Plaintiff] explained that everyone in the concrete business talks to one another, and he was told that he was a problematic worker and not easy to get along with. He said that he disagreed with that. [Plaintiff] stated that these circumstances affect his PTSD, as he cannot tolerate when others talk back or second guess that he is doing things correctly, especially when he can prove that he is correct. He reported that his PTSD is triggered when supervisors think that they are more experienced than he is. [Plaintiff] indicated that in many situations, his supervisors did not have more experience than him.
>
> [Plaintiff] testified that he "snaps and goes off" on others, even with his own family while doing household projects. He said that it is difficult for him to work around others. [Plaintiff] stated that if someone is not paying attention to him when they should and he has to constantly repeat himself, this triggers his anger quickly. He reported that he has a military background where you know rules and regulations, the way things are supposed to be done. [Plaintiff] indicated that he was charged with insubordination when he was in the military.
>
> Because [Plaintiff's] mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.
>
> The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the existence of an underlying mental disorder for a period of at least two years with both: ongoing mental health therapy, psychosocial support, or a highly structured setting that diminishes the symptoms and signs of mental disorders; and a minimal capacity to adapt to changes in the environment or to demands that are not already part of daily life.

(*Id.* at 17-22 (internal record citations omitted)).

The ALJ moved to step four to determine Plaintiff's RFC, considering sources like his medical records, prior administrative medical findings, and the hearing testimony. (*Id.* at 22-28). The ALJ concluded that Plaintiff had the RFC to perform a limited range of light work as defined in 20 C.F.R. § 404.1567(b). (*Id.*). Generally, "light work" refers to work that involves

"lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Moreover, "[e]ven though the weight lifted may be very little, a job is in [the light work] category when it requires a good deal of walking or standing, or when it involves sitting most the time with some pushing and pulling of arm or leg controls." *Id.* Among the limitations to this RFC, however, the ALJ determined that Plaintiff could lift or carry 20 pounds only on occasion and could stand and walk for 6 hours out of an 8-hour workday and sit for 6 hours. (Dkt. No. 10-3 at 22). In terms of mental or psychological limitations, the ALJ determined that Plaintiff could "communicate and interact occasionally with coworkers and supervisors, but never with the public[,]" and that he could "adapt to occasional changes in a routine work environment." (*Id.*).

Overall, the ALJ concluded that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." (*Id.* at 23-24).

In discrediting the extent of Plaintiff's self-reported symptoms and limitations associated with his PTSD, the ALJ offered as follows:

> [T]reatment notes from the VA show that [Plaintiff] did not show up to the mental health clinic for an appointment in January 2022. When he was contacted, he said that he was busy with work, and he would reschedule the appointment when he was available.
>
> Later, in June 2023, at which time the VA contacted [Plaintiff] by telephone to inquire if he was still interested in rescheduling an appointment with the behavioral health interdisciplinary program, he stated that he was doing good and not interested in rescheduling the appointment.
>
> Thereafter, in July 2024, at which time [Plaintiff] went to the VA as a new patient, he was being treated for mental health and taking medication for PTSD.

PTSD and depression screening tests that [Plaintiff] was administered at the VA were negative.

Afterwards, at the physical consultative examination in September 2024, [Plaintiff] said that he had depression, however, he was cooperative, and his mood, affect, and judgment were normal.

Then, on September 30, 2024, in order to procure additional medical evidence, [Plaintiff] had a psychological consultative examination with Ruben Pina, Ph.D. [Plaintiff] stated that he was diagnosed with PTSD and depression. He reported that he had a "very short fuse." [Plaintiff] indicated that he did not want to leave the house since he was "triggered." He mentioned that his hands trembled, and he had nightmares. [Plaintiff] said that he had "lost friends and patients." He stated that he did not want to spend time with friends. [Plaintiff] admitted that he was unhappy with himself. He reported that he had dated a girl for four months, and she blocked him after they broke up. [Plaintiff] indicated that his brother had called him and threatened to place a restraining order against him. He mentioned that he was unable to work due to his physical inabilities. [Plaintiff] admitted that he just sat at home, and his symptoms worsened. He said that he currently took Zoloft and trazodone. [Plaintiff] stated that he graduated from high school and attended basic training as a junior in high school. He reported that he was in the National Guard and had been in active duty. [Plaintiff] indicated that he was previously deployed. He mentioned that he obtained a commercial driver's license. [Plaintiff] said that he worked in the oil fields and concrete pumping, and he had been a concrete salesman. He stated that he reinjured his shoulder and had been unable to work. [Plaintiff] indicated that he had difficulty when he was told he was doing something wrong and had not worked since March 2023.

At the psychological consultative examination, [Plaintiff] was appropriately dressed. His tone was loud, but his speech rate was normal. [Plaintiff] did not show signs of psychomotor retardation or psychomotor agitation. He demonstrated an appropriate attitude during the interview, sat upright on his chair, and answered all of the examiner's questions. [Plaintiff's] thought process was goal oriented. He correctly determined how two fruits were alike. Perceptual abnormalities were not reported. [Plaintiff's] mood was appropriate, with mood congruent affect. His eye contact was good. [Plaintiff] was fully oriented. He provided the correct date and his date of birth. Sensorium appeared to be clear. [Plaintiff's] fund of information was not limited to current events. Based upon clinical interview and observations, is estimated level of intelligence was average. [Plaintiff's] immediate, remote, and recent memory were intact. He correctly named the current and former presidents of the United States and recalled 3 out of 3 words after 5 minutes. [Plaintiff] was able to complete simple math, correctly count in denominations of 2s and 3s, and spell the word "world" forward and backward. His judgment was intact. [Plaintiff] was assessed with PTSD.

(*Id.* at 26-27 (internal record citations omitted)).

The ALJ also explained his reasons for declining to give controlling weight to the opinions of some of Plaintiff's medical providers:

> Eric Wiener, Ph.D., the state agency psychological consultant at the initial level, reported that [Plaintiff's] trauma- and stressor-related disorders and depressive, bipolar, and related disorders are severe, but there is insufficient evidence. The undersigned finds that this opinion is not persuasive because it is not supported by nor consistent with the record that shows [Plaintiff] was diagnosed and treated for depression and PTSD at the VA, and he was assessed with PTSD at a psychological consultative examination.
>
> Then, Suzanne Mitchell, Psy.D., the state agency psychological consultant at the reconsideration level, indicated that there are no mental medically determinable impairments. The undersigned finds that this opinion is not persuasive since it is not supported by nor consistent with the record that shows [Plaintiff] was diagnosed and treated for depression and PTSD at he VA, and he was assessed with PTSD at a psychological consultative examination.
>
> Ruben Pina, Ph.D., reported that [Plaintiff] has limitations in various settings based on observations during the examination to understand, remember, and apply information. Dr. Pina indicated that [Plaintiff] cannot concentrate, persist, and maintain pace with the ability to focus attention on work activities and stay on task at a sustained rate. He reported that [Plaintiff] cannot adapt and manage himself, such as regulating emotions, controlling behavior, and maintaining well-being. Dr. Pina indicated that [Plaintiff] had difficulty with attending, concentrating, and persisting during the exam. The undersigned finds that this opinion is not persuasive since it is not supported by Dr. Pina's own findings that show [Plaintiff] was fully oriented. At the psychological consultative examination, [Plaintiff's] immediate, remote, and recent memory were intact. He was also able to correctly count in denominations of 2s and 3s, complete simple math, and spell the word "world" forward and backward at the psychological consultative examination. Further, at the psychological consultative examination, [Plaintiff's] appearance and presentation were appropriate and adequate, with an appropriate attitude, mood, and affect. The undersigned finds that this opinion is also not consistent with the record that shows normal mental status examinations.

(*Id.* at 27-28 (internal record citations omitted)).

Continuing with step four, the ALJ noted that Plaintiff was unable to perform past work as a concrete pump operator given its "very heavy" exertional level. (*Id.* at 28-29).

At step five, the ALJ assessed Plaintiff's ability to perform other work, considering Plaintiff's RFC, in conjunction with his age, education, and work experience. (*Id.* at 29-31).

The ALJ noted that Plaintiff was a "younger" person as defined in 20 C.F.R. § 404.1563 on the alleged disability onset date, with at least a high school education as defined in § 404.1564. (*Id.* at 29). The ALJ also credited the testimony of the vocational expert, Dr. Gutierrez, who identified the aforementioned jobs in the national economy that someone like Plaintiff could perform. (*Id.* at 30-31). Considering these factors, the ALJ concluded that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy[.]" (*Id.* at 31).

Accordingly, the ALJ concluded that Plaintiff was not disabled and denied his application for benefits. (*Id.*).

## V. STANDARD OF REVIEW

### A. Scope

Judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g) is limited to two inquiries: (i) whether the decision is supported by substantial evidence; and (ii) whether the Commissioner correctly applied the relevant legal standards. *Bednorz v. Comm'r of Soc. Sec.*, 2023 WL 5846804, at *2 (W.D. Tex. Sept. 11, 2023) (citing *Kinash v. Callahan*, 129 F.3d 736, 738 (5th Cir. 1997) (per curiam)).

Evidence is substantial where it is more than a scintilla but less than a preponderance, such that a reasonable mind could accept it as adequate to support a conclusion. *Bessey v. Berryhill*, 2019 WL 1431599, at *2 (W.D. Tex. Mar. 29, 2019) (quoting *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (per curiam)) (quotations omitted). Substantiality, in this context, requires the weighing of four elements of proof: (i) objective medical facts; (ii) diagnoses and opinions of treating and examining physicians; (iii) the claimant's subjective evidence of pain and disability; and (iv) the claimant's age, education, and work history. *Martinez*, 64 F.3d at 174

(citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (per curiam)). A reviewing court may not reweigh the evidence, try the issues de novo, or substitute their judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing *Haywood v. Sullivan*, 888 F.2d 1463, 1466 (5th Cir. 1989) (per curiam)). All a court may do is scrutinize the record for substantial evidence supporting the Commissioner's decision. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (citing *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987)). A final decision of the Commissioner supported by substantial evidence must be affirmed. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (per curiam). A court may not find a lack of substantial evidence unless there is (i) a conspicuous absence of credible choices or (ii) no contrary medical evidence. *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (per curiam) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (per curiam)).

"Procedural perfection in administrative proceedings is not required[,]" and thus an administrative judgment will be vacated only where "the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). The procedural improprieties at issue must "cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988) (per curiam). Otherwise, an error is harmless "when it is inconceivable that a different administrative conclusion would have been reached absent the error." *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (per curiam). Therefore, to establish error that warrants remand, a plaintiff must show that that the SSA's decision might have been different absent the error. *See Martinez v. Saul*, 2020 WL 5536814, at *17 (N.D. Tex. Aug. 31, 2020) (citing *Bornette*, 466 F. Supp. 2d at 816), *report and recommendation adopted sub nom. Martinez o/b/o Marquez v. Saul*, 2020 WL 5531485 (N.D. Tex. Sept. 15, 2020).

**B. Remand**

A district court is authorized by 42 U.S.C. § 405(g) to remand a social security case to the Commissioner for further administrative action. *See Melkonyan v. Sullivan*, 501 U.S. 89, 101-02 (1991). This authorization is limited to that afforded by § 405(g)'s sentence four or sentence six. *Id.* "[R]emand orders must either accompany a final judgment affirming, modifying, or reversing the administrative decision in accordance with sentence four, or conform with the requirements outlined by Congress in sentence six." *Id.*

Relevant here is sentence four. The fourth sentence of section 405(g) authorizes a district court to issue a remand order upon the pleadings and transcript of the record, either affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C. § 405(g). A sentence-four remand is appropriate when the evidence on the record is insufficient to support the Commissioner's final decision and further fact-finding is necessary. *See Kleja v. Barnhart*, 220 F. Supp. 2d 1330, 1334-35 (M.D. Fla. 2002), *aff'd*, 49 F. App'x 290 (11th Cir. 2002). Essentially, a sentence four remand is a determination that the SSA erred in deciding to deny benefits. *Hoa Hong Van v. Barnhart*, 483 F.3d 600, 605 (9th Cir. 2007).

**VI. ANALYSIS**

As noted, Plaintiff raises two issues, specifically, that the ALJ erred in determining, at step three, that Plaintiff did not have an impairment that met the respective impairment listed in the appendix to the SSA regulations and, for purposes of step four and step five, that Plaintiff retains the RFC to perform work in the national economy despite his impairments.

In terms of step three, Plaintiff claims that the ALJ erred in determining that his impairment of PTSD did not meet the Listing 12.15 impairment for Trauma- and Stressor-

Related Disorders.[3] In support, Plaintiff points to his self-reports—including his hearing testimony—about his anxiety and social interaction issues, reclusive lifestyle, temper and mood swings, inability to hold a job, flashbacks and nightmares, and military insubordination. (Dkt. No. 14 at 2). Presumably, Plaintiff is of the view that the ALJ should have given greater weight to these self-reports, as compared to the rest of the evidence, to find that his PTSD met the severity requirements of the listing in question. (*See id.* at 3).

Plaintiff also contends that the ALJ erred in determining that he can still perform work in the national economy despite his PTSD-related inability to hold employment. In support, Plaintiff points to his testimony about being terminated from multiple positions due to his belligerence with supervisors and insubordination. (*Id.* at 3-4). Presumably, again, Plaintiff takes the position that the ALJ should have given greater weight to his self-reports over the rest of the evidence. (*See id.*).

Indeed, both issues raised by Plaintiff hinge on the ALJ's credibility findings over his self-reports or subjective symptoms. The evaluation of a claimant's subjective symptoms generally involves a two-step analysis. *Walters v. Colvin*, 2014 WL 412551, at *15 (E.D. Va. Feb. 3, 2014) (citing *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir.1996)); *see also* 20 C.F.R. § 404.1529(a). The first step is to determine whether there is an underlying medically

---

[3] More specifically, Plaintiff contends that the ALJ erred in determining that his impairments of PTSD and "Anxiety" did not meet the respective listings. (Dkt. No. 14 at 2-3). Whereas PTSD is covered by Listing 12.15 of the appendix, Anxiety and Obsessive-Compulsive Disorders are covered by Listing 12.06, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06. To be clear, the ALJ did not consider an anxiety disorder as an impairment but, rather, PTSD and Major Depressive Disorder under Listing 12.04. (*See* Dkt. No. 10-3 at 15, 17). The reason can be gleaned from a precise examination of Plaintiff's medical records and the SSA listings. Although the medical records reflect that Plaintiff did complain of anxiety to his medical providers and examiners (*see, e.g.*, Dkt. No. 10-8 at 379), there is little indication that he was diagnosed with an anxiety-type disorder. It appears that Plaintiff was instead diagnosed—by the VA for example—with "adjustment disorder with anxiety." (*See, e.g.*, Dkt. No. 10-6 at 37, 74). According to the listings, "adjustment-like disorders" are to be evaluated under the listing for PTSD, that is, Listing 12.15. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(B)(11)(b). The ALJ thus seems to have correctly evaluated Plaintiff's claimed anxiety in the context of evaluating his PTSD.

determinable physical or mental impairment or impairments that reasonably could produce the claimant's symptoms. *Walters*, 2014 WL 412551, at *15 (citing *Craig*, 76 F.3d at 594). If so, the second step requires the evaluation of a claimant's statements about the intensity and persistence of the symptoms and the extent to which they affect the claimant's ability to work. *Id.* (citing *Craig*, 76 F.3d at 595). This evaluation must account for all of the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the claimant's statements. *Id.* (citing *Craig*, 76 F.3d 595-96) (quotations omitted). If the ALJ finds that the claimant's testimony is not entirely reliable, the ALJ must offer sufficient reasons to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Krossman v. Colvin*, 2016 WL 452136, at *2 (D. Or. Feb. 3, 2016) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)). In weighing the claimant's credibility, the ALJ may consider factors such inconsistencies either in the claimant's testimony or between their testimony and their conduct, the claimaint's daily activities, the claimant's work record, and evidence from physicians and third parties as to the nature, severity, and effect of the claimant's symptoms. *See id.* (quoting *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)) (quotations omitted). If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court may not recalculate the ALJ's determination of the weight of the evidence or second-guess the credibility determination. *Id.* (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999)); *see also Wilkins v. Colvin*, 2015 WL 3936141, at *14 (W.D. Tex. June 26, 2015) (citing *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir.1992)).

Here, the ALJ stated sufficient reasons for not giving full weight to Plaintiff's self-reported symptoms and limitations associated with his PTSD. (*See* Dkt. No. 10-3 at 26-27).

These reasons were grounded in factors like inconsistencies between Plaintiff's testimony and his conduct, as well as inconsistencies with the evidence from physicians and third parties. *See Krossman*, 2016 WL 452136, at *2. The ALJ noted that Plaintiff did not show up for a VA mental health appointment in January 2022 because he was busy with work. (Dkt. No. 10-3 at 26). The ALJ noted that, in June 2023, Plaintiff stated that he was not interested in a follow-up because he was "doing good." (*Id.*). The ALJ noted that Plaintiff screened negative for PTSD and depression at the VA in July 2024. (*Id.*). The ALJ noted that, at his September 2024 consultative physical examination, Plaintiff was cooperative, and his mood, affect, and judgment were normal. (*Id.*). Moreover, the ALJ noted that, according to the October 2024 psychological consultative examination, Plaintiff was—

> appropriately dressed. His tone was loud, but his speech rate was normal. [Plaintiff] did not show signs of psychomotor retardation or psychomotor agitation. He demonstrated an appropriate attitude during the interview, sat upright on his chair, and answered all of the examiner's questions. [Plaintiff's] thought process was goal oriented. He correctly determined how two fruits were alike. Perceptual abnormalities were not reported. [Plaintiff's] mood was appropriate, with mood congruent affect. His eye contact was good. [Plaintiff] was fully oriented. He provided the correct date and his date of birth. Sensorium appeared to be clear. [Plaintiff's] fund of information was not limited to current events. Based upon clinical interview and observations, is estimated level of intelligence was average. [Plaintiff's] immediate, remote, and recent memory were intact. He correctly named the current and former presidents of the United States and recalled 3 out of 3 words after 5 minutes. [Plaintiff] was able to complete simple math, correctly count in denominations of 2s and 3s, and spell the word "world" forward and backward. His judgment was intact.

(*Id.* at 26-27).

Because the ALJ offered sufficient reasons in support of this credibility determination, the Magistrate Judge will not re-weigh Plaintiff's testimony against the other evidence or otherwise second-guess the ALJ's determination. *See Krossman*, 2016 WL 452136, at *2; *see also Wilkins*, 2015 WL 3936141, at *14. Moreover, insofar as this credibility determination is

undisturbed, the Magistrate Judge finds no room to reverse the ALJ's decision. Consistent with step three, the ALJ found that despite Plaintiff's mental impairments, these did not cause at least two "marked" limitations or one "extreme" limitation, such that Plaintiff failed to meet the "paragraph B" criteria. (Dkt. No. 10-3 at 16-21). Nor did the evidence show, in terms of the "paragraph C" criteria, that Plaintiff had no more than a minimal capacity to adapt to changes in the environment or demands of daily life. (*Id.* at 22). Then, in determining Plaintiff's RFC for purposes of step four and step five, the ALJ was of the opinion that Plaintiff could "communicate and interact occasionally with coworkers and supervisors, but never with the public[,]" and that Plaintiff could "adapt to occasional changes in a routine work environment." (*Id.*). Ultimately, the ALJ believed that Plaintiff was overstating his inability to comply with authority figures, and the Magistrate Judge finds no reason to disturb that finding.

For these reasons, the Magistrate Judge concludes that the ALJ determinations in question are supported by substantial evidence, and that the ALJ correctly applied the relevant legal standards.

## VII. CONCLUSION

As such, the final decision of the Commissioner is AFFIRMED, and this civil action will be DISMISSED.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 3rd day of August 2026.

J. SCOTT HACKER
United States Magistrate Judge